Filed 5/1/14  P. v. Staines CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058889 |
| v. | (Super.Ct.No. BAF1200500) |
| GARY ALAN STAINES, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Gary B. Tranbarger, Judge.  Affirmed.

Sheila Quinlan, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel and Sabrina Y. Lane-Erwin, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Gary Alan Staines was charged with a single count of possession of a controlled substance.  (Health & Saf. Code, § 11377, subd. (a).)

1

Defendant filed a motion to suppress evidence, pursuant to Penal Code section 1538.5.[1] The court denied the motion. The court subsequently granted defendant's request to reduce the charge to a misdemeanor, pursuant to section 17, subdivision (b)(4), and defendant pled guilty. The court placed him on probation for three years.

On appeal, defendant challenges the denial of his suppression motion. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The following evidence was presented at the hearing on the motion to suppress:

*Prosecution Evidence*

On August 1, 2012, Officers Gregory Sell, Chris Ternes, and Jacqueline Lane went to a residential home (the residence) to conduct a probation compliance check on Steven Sass. Officer Sell testified that the residence was listed as Sass's probation address, and that he had prior knowledge that Sass lived there. Officer Sell had assisted with a search warrant on the residence that resulted in finding drugs there approximately one year earlier. At that time, Sass was placed on probation. Furthermore, Officer Sell and his partner observed the residence for drug activity "on a frequent basis" because of complaints from neighbors.

Officer Sell knocked on the door of the residence and Kathryn Tobin answered. He explained his reason for the visit, and she invited him and the other officers inside. Tobin told them Sass was not there and mentioned that there were other occupants inside

---

[1] All further statutory references will be to the Penal Code, unless otherwise noted.

the house. Officer Sell called the other occupants to come toward the officers. The occupants, including defendant, came forward. The officers had everyone sit down in the dining area. Sass did not appear. Officer Sell testified that it was common for people to say a probationer was not home, when he/she was really hiding in the house. The officers began to search for Sass in the house. They also wanted to secure the home for officer safety purposes.

While the officers went inside the house, Officer Lane secured the perimeter of the house. She estimated that it took her five minutes to ensure that no one was coming outside. Then she entered the residence. Upon entering, Officer Lane saw several people sitting around a table, including defendant. No one informed her of whether the other officers had already swept the house for safety purposes. She believed there were areas that had not been swept yet. Officer Lane testified that she had been at that residence before and knew from experience that there were generally a lot of people in the house. At a prior visit, the officers were there for 20 to 30 minutes before they found the suspect hiding. Officer Lane said that upon entering the residence that day, she saw some of the officers going to the right; so she and her partner went to the left. They proceeded to check the south side of the residence to make sure that no one was hiding and to look for Sass. When Officer Lane entered one bedroom, she looked around and saw a table in the center of the room. She saw "a piece of plastic tied up" on top of the table, in plain view. She testified that, in her training and experience, when she would find methamphetamine, it was usually in a plastic baggie or "tied up in just plastic." Thus, she knew that the piece of plastic tied up on the table could contain drugs. Officer Lane picked it up, and it

3

looked and felt like it possibly contained methamphetamine. She and her partner both remarked, "Looks like meth." Officer Lane knew from the last time she was at the residence that defendant and Tobin stayed in that room. She asked Tobin to come in to the room to speak with her, and then she asked to speak with defendant.

*Defense Evidence*

Albert Garcia testified that he was at the residence on the morning of the probation search. He was there speaking with defendant in defendant's room. Garcia said there was a coffee table in that room, and he put his cigarettes and lighter on it. He did not notice a baggie sitting on the table.

After the close of evidence, defense counsel argued that the police had no reason to believe that Sass was living at the residence. He further contended that once they were in the house, the search went beyond a safety sweep. He argued that it was disingenuous of Officer Lane to say that she did not believe a safety sweep had been conducted since the officers had been in the residence for five minutes before she entered. Counsel further argued that the police had conducted an illegal search since Sass, the probationer, did not have access to defendant's room. Thus, the police could not search that room as part of their probation search. The prosecutor argued that, right before he went to the residence, Officer Sell confirmed that Sass was registered at that address. Therefore, the officers were within their rights to enter the residence to conduct a probation compliance search. Furthermore, Officer Lane testified that she had been there on a prior occasion and it took officers 20 minutes to find the suspect.

4

The court remarked that officers "have the same problem with times that every other witness appears to have." The court stated that it had "heard too many witnesses, both law enforcement officer and non-law enforcement officer, say that something took five minutes, when it probably took 30 seconds." The court stated that the way it viewed the evidence, Officer Lane was the first person to go into defendant's bedroom to look for Sass in particular, and to look for unknown persons who might be hiding in general. The court held that the search was reasonable and appropriate for officer safety purposes. The court further found credible Officer Lane's testimony that the small bindle was in plain sight. The court noted that Garcia easily could have not noticed it on the table, especially if there were other items there.

The court denied the motion to suppress.

### ANALYSIS

#### The Trial Court Properly Denied the Suppression Motion

Defendant argues that the court erred in denying his motion to suppress because there was no justification for a protective sweep of the house, and because Officer Lane did not have probable cause to believe the piece of plastic in his room contained contraband. We conclude that the protective sweep was proper and that Officer Lane properly seized the piece of plastic.

A. *Standard of Review*

"Our standard of review on appeal from the denial of a motion to suppress is well established. We defer to the trial court's factual findings where supported by substantial evidence, but we must exercise our independent judgment to determine whether, on the

5

facts found, the search and seizure was reasonable under the Fourth Amendment standards of reasonableness. [Citation.]" (*People v. Avila* (1997) 58 Cal.App.4th 1069, 1073-1074 (*Avila*).)

B. *The Protective Sweep Was Justified*

A protective sweep "is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others." (*Maryland v. Buie* (1990) 494 U.S. 325, 327 (*Buie*).) Police officers have a legitimate interest in "taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." (*Id*. at p. 333.) In *Buie*, the United States Supreme Court held, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." (*Id*. at p. 337.) Thus, officers do not need probable cause to conduct a protective sweep, but only reasonable suspicion. (*People v. Ledesma* (2003) 106 Cal.App.4th 857, 863 (*Ledesma*).) The United States Supreme Court "has repeatedly held that in determining the existence of reasonable suspicion, courts must evaluate the "'totality of the circumstances'" on a case-by-case basis to see whether the officer has "'a particularized and objective basis'" for his or her suspicion. [Citation.] The court has emphasized the importance of allowing the officers on the scene 'to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that "might well elude an untrained person."

6

[Citations.]' [Citation.]" (*Ibid*.) A security sweep may also precede a probation search. (*Id*. at p. 864.)

In *Ledesma*, *supra*, 106 Cal.App.4th 857, a court upheld a protective premises sweep prior to a valid probation search. The court held that the limited protective sweep was justified where it was based on information known to the investigating officers, and then "filtered through the lens of their experience and training." (*Id*. at p. 865.) The court noted that "a prudent officer will consider the safety concerns triggered by a search in determining the appropriateness of first conducting a sweep and a reviewing court must do the same." (*Id*. at pp. 864-865.)

Here, the information known to the investigating officers, filtered through the lens of their experience and training, justified the protective sweep undertaken. The officers were performing a probation compliance check on Sass. Some of the same officers had found drugs at this same residence just one year prior. Sass was placed on probation because of the drugs previously found there. When the police arrived at the residence, there were four or five people who came forward after the officers called them out into the dining area. However, Sass was not one of them. In Officer Sell's experience, he knew that it was common for people to say that probationers were not at home, when they were actually hiding somewhere in the house. Thus, even though someone said Sass was not home, it was reasonable for the police to search the house for him. It was also reasonable to suspect that there may be others in the house. Drug users and those who associate with them are likely to "have transients 'in and out of their house at all times of the day or night.'" (*Ledesma*, *supra*, 106 Cal.App.4th at p. 865.) They also "are apt to

have weapons in the house." (*Ibid.*)  Therefore, a search of the house to look for Sass and to protect the safety of the officers was justified.

Defendant argues that "[a]ny inference that the drug probationer's presence would make it more likely that dangerous persons could be harbored at the home was not reasonable" since Sass had not been seen at the residence in a few months.  Defendant also asserts that the fact that there had been complaints from neighbors about drug activity at the residence "did not provide adequate justification for believing that the home could harbor dangerous persons," since there was no evidence of when the neighbors complained.  Similarly, there was no evidence as to when Officer Lane previously visited the residence.  Defendant asserts that the People's reliance on these facts was "meaningless" since the prosecution "neglected to link any suspected illicit activity" to the people that were at the residence when the police arrived.  However, the evidence showed that the residence was Sass's confirmed address, the officers had found drugs there only one year prior, Officer Sell frequently observed the house due to the neighbors' complaints, he had seen Sass there fairly recently, and there were several people at the residence when the police arrived.  Considering all of these facts, together with the rational inferences from them, the officers had reasonable suspicion to justify a search of the premises for Sass, and to conduct a protective sweep.  (See *Ledesma*, *supra*, 106 Cal.App.4th at p. 863.)

Defendant further claims that Officer Lane's sweep of the residence, particularly defendant's bedroom, "went beyond the scope of what [was] permitted," since the house had already been secured by the other officers.  He asserts that "the court's finding that

8

Deputy Lane actually entered the home after 30 seconds, not five minutes as she testified, [was] not supported by substantial evidence." He also contends that the evidence did not support the court's finding that Officer Lane was the first officer to go into his bedroom. Defendant concludes that "the only reasonable inference" to draw from the evidence was that other officers had swept his bedroom prior to Officer Lane's entry into the house.

First, we note that the court did not actually find that Officer Lane entered the home after 30 seconds. It merely stated that it had heard "too many witnesses, both law enforcement officer and non-law enforcement officer, say that something took five minutes, when it probably took 30 seconds." The court did, however, find that Officer Lane was the first person to go into defendant's bedroom, and we defer to this factual finding since there was no definitive evidence that the other officers had already checked the room. (See *Avila*, *supra*, 58 Cal.App.4th at pp. 1073-1074.) The evidence showed that Officer Lane checked the perimeter of the house, while the other officers went inside. When she subsequently entered the residence, she was not informed about whether or not defendant's bedroom had been swept. She believed there were still areas of the home that the officers had not swept. In her 20 years of performing these types of searches, there were numerous times when "officers [had] actually missed people." Thus, she "like[d] to make sure [herself]." Additionally, Officer Lane had been at that residence before and knew there were "generally a lot of people in the house." During her prior visit to the residence, the officers took 20 to 30 minutes before they found the suspect hiding. Therefore, when she entered the residence and saw some of the officers "going to the right," she "went to the left," or the south side of the house, and began to search.

9

Given the information known to Officer Lane, filtered through the lens of her experience and training, we cannot say that her search of defendant's room was unreasonable under the Fourth Amendment. (See *Ledesma*, *supra*, 106 Cal.App.4th at p. 865.)

C. *The Evidence Seized Was in Plain View*

Defendant next argues that Officer Lane did not have probable cause to believe the piece of plastic she found on top of the table in his room contained contraband. He claims that "[t]he incriminating character of the object—that it contained methamphetamine—was not 'immediately apparent' as [Officer] Lane viewed the object on the table." Thus, her seizure of the item was unreasonable under the Fourth Amendment. The People counter that the seizure was justified under the "plain view" doctrine. We agree with the People.

"'When officers, in the course of a bona fide effort to execute a valid search warrant, discover articles which, although not included in the warrant, are reasonably identifiable as contraband, they may seize them whether they are initially in plain sight or come into plain sight subsequently, as the result of the officers' efforts.' [Citation.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 563.) "To justify such a seizure, the officers must lawfully be in the position from which they view the item; the incriminating character of the item as contraband or evidence of a crime must be immediately apparent; and the officers must have a lawful right of access to the object. [Citations.]" (*People v. Gallegos* (2002) 96 Cal.App.4th 612, 622.) "The incriminating nature of the item is 'immediately apparent' when the police have probable cause to believe it is contraband or evidence of a crime; officers need not know, to a near certainty, that the item is evidence

10

of a crime. [Citations.] '[P]robable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," [citation], that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. [Citation.]' [Citation.]" (*Id*. at p. 623.)

Here, Officer Lane was at a residence where drugs had previously been found, and she saw, in plain view, a torn, tied up piece of plastic on the table. She testified that she had training and experience with regard to the packaging of methamphetamine, and that she knew it was often "tied up in just plastic." Thus, Officer Lane immediately recognized that the piece of plastic on the table likely contained methamphetamine. We note defendant's claim that Officer Lane's recognition occurred only after she picked up and manipulated the plastic. However, these facts demonstrate that, under the principles set forth above, Officer Lane had probable cause to believe that the plastic contained methamphetamine *before* she picked it up.

In arguing that the detective lacked probable cause, defendant relies on *Arizona v. Hicks* (1987) 480 U.S. 321 (*Hicks*). In that case, officers lawfully entered the defendant's apartment in search of weapons and the shooter, after shots were fired from the apartment. (*Id.* at p. 323.) One of the officers noticed expensive stereo equipment that appeared to be out of place in the squalid apartment. (*Ibid.*) Suspecting that the equipment had been stolen, the officer read and recorded the serial numbers. (*Ibid.*)

11

However, in order to do so, he had to move some of the equipment to view concealed portions of it. (*Ibid.*) The Supreme Court held that this movement constituted a search for which probable cause was required. (*Id.* at pp. 324-326.) The prosecution conceded that the officer did not have probable cause to believe the equipment was stolen. (*Id.* at p. 326.) Therefore, the Court held that the movement of the equipment constituted an illegal search. (*Id.* at pp. 326-327.)

Defendant analogizes the movement of the stereo equipment in *Hicks* to Officer Lane's seizure of the piece of plastic from the table. However, *Hicks* is readily distinguishable since, as the prosecution conceded, the officer did not have probable cause to believe the equipment was stolen before he moved it. (*Hicks*, *supra*, 480 U.S. at p. 326.) Here, Officer Lane did have probable cause. (See *ante*.)

Ultimately, on the facts found, we conclude that the search and seizure was reasonable under the Fourth Amendment standards of reasonableness. Therefore, the trial court properly denied the motion to suppress evidence.

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST_____
Acting P. J.

We concur:

KING_____
J.

MILLER_____
J.